**EXXON CORPORATION, A New Jersey Corporation, Plaintiff,**

v.

**CROSBY–MISSISSIPPI RESOURCES, LTD., A Mississippi Limited Partnership, Lynn Crosby Gammill, General Partner, Stewart Gammill, III, General Partner, Defendants.**

Civ. A. No. J89–0628(B).

United States District Court, S.D. Mississippi, Jackson Division.

Oct. 15, 1991.

Otis Johnson, Jr., Heidelberg, Woodliff & Franks, Jackson, Miss., for plaintiff.

Harold D. Miller, Jr., A. Camille Henick, Jackson, Miss., for defendants.

## MEMORANDUM OPINION AND ORDER

BARBOUR, Chief Judge.

This cause is before the Court on the Motion of Plaintiff for Partial Summary Judgment. The Court, having considered the Motion together with responses, memoranda and other supporting documents, is of the opinion that the Motion of Plaintiff Exxon Corporation ("Exxon") for Summary Judgment should be granted in part and denied in part.

### I. Facts and Procedural History

This case and a companion case [1] were initiated by Plaintiff Exxon, a New Jersey corporation, to collect money allegedly owed by Defendants Crosby–Mississippi Resources, Ltd. ("Crosby–Mississippi") and Lynn Crosby Gammill and Stewart Gammill, III, general partners of Crosby–Mississippi, a Mississippi limited partnership. On April 3, 1985, Plaintiff Exxon and Defendants Lynn and Stewart Gammill, through Crosby–Mississippi, entered into a Joint Operating Agreement ("Operating Agreement") governing operations conducted by Exxon on the Oliver Poole 4–1 Oil Well ("the Well") in Amite County, Mississippi.[2]

The Operating Agreement designated Plaintiff as "Operator" and Defendants as "Non–Operator." Operators such as Plaintiff conduct "all operations necessary or proper for the development, operation, protection and maintenance" of the joint property on which drilling takes place.[3] Council of Petroleum Accountant Societies ("CO-PAS") Accounting Procedure Joint Operations, "I. General Provisions." Non–Operators such as Defendants bear proportionate shares of the costs and share in the royalties derived from the operation of oil wells.

The parties used two model forms to create the Operating Agreement: Form 610 of the American Association of Petroleum Landmen ("AAPL") 1982 Model Form Operating Agreement, and Council of Petroleum Accountant Societies ("COPAS") Accounting Procedure Joint Operations. Form 610 is a standard form agreement used frequently in joint oil drilling ventures between Operators and Non–Operators that governs the exploration and develop-

---

1. *Exxon v. Crosby–Mississippi Resources, et al.,* Civ.Action No. J89–0627(B) (S.D.Miss.)

2. Joint ventures in the oil business are not uncommon and have always been an important part of the oil and gas industry. Gary B. Conine, "Property Provisions of the Operating Agreement," 19 *Texas Tech L.Rev.* 1263, 1264 (1988); Granville Dutton, "Accounting Procedures: Contracts or Controversies," 19 *Rocky Mtn.Min.L.Inst.* 17 (1974). These operations facilitate development and exploration, and in-

crease production efficiency. Conine at 1264; Dutton at 17.

3. Pursuant to the Operating Agreement, Exxon drilled the Well and, after reaching total depth, decided to set pipe and complete the well for the production of oil or gas. Crosby–Mississippi joined in the completion attempt. The Well was completed as an oil well in the interval between 11,771 through 11,777 feet, and operated by Exxon after completion.

ment of oil, gas and mineral leases and interests, and covers, among other matters, the responsibilities of the Operator, the expenditures and liabilities of the Operator and the Non–Operator, the payment of royalties and the procedures for exploration, drilling and development.

COPAS developed the Accounting Procedure for use in conjunction with the AAPL Operating Agreement. The Accounting Procedure allocates the liabilities and expenditures for which all parties to the Joint Operating Agreement will be responsible and defines the ways in which an Operator will account for the costs incurred in operating an oil well. *See* Dutton at 117. Specific provisions of the Accounting Procedure address such matters as direct charges, pricing, inventories and overhead.

To recoup its share of the expenses resulting from daily operation of the Well, Plaintiff issued to Defendants monthly Joint Operations Statements listing the costs incurred from drilling, and later, completing and operating the Well. Plaintiff began issuing Joint Operations Statements in February 1985, and with the exception of May 1985,[4] issued the Statements through September, 1988.

Defendants did not pay Plaintiff for expenses billed through the Joint Operations Statements, nor did Defendants pay Plaintiff pursuant to Status of Account statements issued monthly by Plaintiff to Defendants after Defendants became delinquent in their account with Plaintiff.[5] Defendants never responded in writing to any of the statements issued by Plaintiff.

On November 6, 1989, Plaintiff brought suit against Defendants seeking collection of money allegedly owed by Defendants to Plaintiff under the parties' Operating Agreement. In the present Motion for Partial Summary Judgment, Plaintiff relies on Paragraph I.4 of the COPAS Accounting Procedure Joint Operations, which the parties incorporated into their Operating Agreement. Paragraph I.4 provides as follows:

4. Adjustments—Payment of any such bills shall not prejudice the right of any Non–Operator to protest or question the correctness thereof; provided, however, all bills and statements rendered to Non–Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non–Operator takes written exception thereto and makes claim on Operator for adjustment.

Plaintiff argues that Defendants cannot now challenge the validity of amounts billed in the Joint Operations Statements and Status of Account Statements because Defendants failed to take written exception to the Statements within the time period specified in Paragraph I.4 of the Operating Agreement.

As further support, Plaintiff relies on Paragraph I.5 of the Accounting Procedure, which provides as follows:

5. Audits—A Non–Operator, upon notice in writing to Operator and all other Non–Operators, shall have the right to audit Operator's accounts and records relating to the Joint Account for any calendar year within the twenty-four (24) month period following the end of such calendar year; provided, however, the making of an audit shall not extend the time for the taking of written exception to and the adjustments of accounts as provided for in Paragraph 4 of this Section I. Where there are two or more Non–Operators, the Non–Operators shall make every reasonable effort to conduct joint or simultaneous audits in a manner which will result in a minimum of inconvenience to the Operator. Operator shall bear no portion of the Non–Operators' audit cost incurred under this paragraph unless agreed to by the Operator.

---

4. Defendants contend that they did not receive Joint Operations Statements for February and May 1985. The Court addresses this matter below.

5. Status of Account Statements are issued monthly to Non–Operators participating in wells with Exxon who become delinquent in their accounts.

Plaintiff contends that the failure of Defendants to make an audit as provided by Paragraph I.5 of the Operating Agreement is further proof that Defendants did not take written exception to the Joint Operations Statements and Status of Account Statements.

Defendants argue that Paragraph I.4 does not apply to situations where there has been no payment. In the alternative, Defendants contend that if Paragraph I.4 does apply, Plaintiff is not entitled to Partial Summary Judgment because Paragraph I.4 violates Mississippi law, because Plaintiff breached the Operating Agreement, because Defendants did not receive certain bills, and because Paragraph I.4 does not apply to bills received after December 31, 1986.

## II. Analysis

Rule 56 of the Federal Rules of Civil Procedure states in relevant part that summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56(c). The United States Supreme Court has held that this language "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an essential element to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *see also Moore v. Mississippi Valley State University,* 871 F.2d 545, 549 (5th Cir. 1989); *Washington v. Armstrong World Industries, Inc.,* 839 F.2d 1121, 1122 (5th Cir.1988).

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record in the case which it believes demonstrate the absence of a genuine issue of fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. However, the movant need not support the motion with materials that negate the opponent's claim. *Id.* As to issues on which the non-moving party has the burden of proof at trial, the moving party need only point to portions of the record that demonstrate an absence of evidence to support the non-moving party's claim. *Id.* at 323–24, 106 S.Ct. at 2552–53. The non-moving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553.

Summary judgment can be granted only if everything in the record demonstrates that no genuine issue of material fact exists. The district court, therefore, must not "resolve factual disputes by weighing conflicting evidence.... since it is the province of the jury to assess the probative value of the evidence." *Kennett–Murray Corp. v. Bone,* 622 F.2d 887, 892 (5th Cir. 1980). Summary judgment is improper merely where the court believes it unlikely that the opposing party will prevail at trial. *National Screen Service Corp. v. Poster Exchange, Inc.,* 305 F.2d 647, 651 (5th Cir. 1962).

The following issues are raised by Plaintiff's Motion for Partial Summary Judgment and are properly before the Court: (1) Whether a party who fails to take written exception within the time period provided by COPAS Accounting Procedure Joint Operations Paragraph I.4 is barred from contesting the validity of bills because such bills are entitled to a "conclusive presumption of correctness;" (2) whether Paragraph I.4 creates a statute of limitations in violation of Miss.Code Ann. § 15–1–5; (3) whether the "conclusive presumption of correctness," if appropriate, may be rebutted; (4) whether, and in what circumstances, an Operating Agreement may be reformed; (5) whether an answer to a lawsuit constitutes "written exception" as provided by COPAS Accounting Procedure Joint Operations Paragraph I.4; and (6) whether actual receipt of bills and statements is necessary for the "presumption of correctness" to apply.

*Paragraph I.4 of the COPAS Accounting Procedure*

### 1. Written Exception and the Conclusive Presumption of Correctness

█ Paragraph I.4 of the COPAS Accounting Procedure, titled "Adjustments," [6] provides that all bills to which "written exceptions" is not taken within twenty-four months from the end of the billing year shall "conclusively be presumed to be true and correct." Plaintiff contends that the failure of Defendants to take written exception to bills rendered by Plaintiff entitles Plaintiff to Partial Summary Judgment. Defendants contend that Paragraph I.4 does not apply to situations where no payments have been made.

At the outset, it is important to note that few courts, and no courts in this jurisdiction or the State of Mississippi, have construed Paragraph I.4 of the COPAS Accounting Procedure. Nevertheless, sufficient authority exists to support a finding that Paragraph I.4 entitles monthly billing statements to which a Non–Operator has not responded to a conclusive presumption of correctness.

In *In re Antweil,* 115 B.R. 299 (Bkrtcy. D.N.M.1990), the United States Bankruptcy Court for the District of New Mexico held that a Non–Operator who failed to take written exception within the Paragraph I.4 limitation period incorporated in the parties' joint operating agreement could not set off in-kind contributions to an Operator. The Non–Operator in *Antweil* provided equipment and property worth $200,357.66 in kind to the operation of oil wells pursuant to the parties' joint operating agreement, but was not credited in monthly billing statements for over $76,000 worth of in kind contributions. The Non–Operator received monthly statements listing the Non–Operator's proportionate share of expenses for the operation of oil wells, which totalled over $110,00, and orally objected to the Operator's failure to give credit. The Non–Operator, however, never took exception to the statements in writing.

The Non–Operator challenged the billing statements on the basis of mistake. The court rejected this challenge, and found that the bills were to be presumed correct after the expiration of the limitations period. The Non–Operator was bound by the terms of the joint operating agreement because he waived his right to object by failing to take written exception within the specified time period. Therefore, the Non–Operator was obligated to satisfy the account balance, even though he did not receive $76,000 credit for his in-kind contributions to the oil wells.

The court neither explicitly nor implicitly predicated its holding on the Non–Operator's partial satisfaction of his account. Rather, the court emphasized the Non–Operator's failure to comply with the unambiguous procedure for challenging bills set forth in Paragraph I.4 of the joint operating agreement. The court stated that its holding was "distasteful," because it obligated the Non–Operator to pay a debt resulting from overbilling and failing to credit the account of the Non–Operator, yet the court was unwilling to venture beyond the plain meaning of the joint operating agreement. The court noted that:

> He [the Non–Operator] entered into the contract with full knowledge and did not comply with the requirement to take exception in writing within the limitation period. He must now abide by his own agreement.

In *Caddo Oil Co., Inc. v. O'Brien,* Civil Action No. 86–0988 (W.D.La.1988), *affirmed* 908 F.2d 13 (5th Cir.1990), the United States District Court for the Western District of Louisiana held that a Non–Operator who failed to exercise his option to request an audit within a limitations period provided in a joint operating agreement could not contest the validity of billing amounts after the limitations period had expired. The Operating Agreement provided that a Non–Operator had the right to audit the accounts of the Operator within twelve months of the end of any calendar year. Following an audit, a Non–Operator

---

**6.** Neither AAPL Form 610 nor the COPAS Accounting Procedure defines "adjustment."

had thirty days in which to take written exception.

The court held that a "presumption of correctness" attached to amounts billed that were not timely challenged by written exception taken subsequent to an audit. Unlike Paragraph I.4 in the case before this Court, the audit provision in *Caddo* did not explicitly provide for a conclusive presumption of correctness to attach to billing statements to which exception was not taken. The *Caddo* court inferred such a presumption from the language of the audit provision. Moreover, the *Caddo* court did not state that payment of monthly bills was necessary for a Non–Operator to obtain an audit.

The Fifth Circuit affirmed the district court on appeal, and stated that the billings were entitled to a presumption of correctness because the Non–Operator failed to conduct an audit within the lengthy time period specified in the audit provision. *Caddo Oil Co. v. O'Brien*, 908 F.2d 13, 17 (5th Cir.1990).

Finally, in *Woods Petroleum Corp. v. Hummel*, 784 P.2d 242 (Wyo.1989), the Wyoming Supreme Court held that an Operator that had underbilled a Non–Operator could not attempt to collect the additional amount from the Non–Operator after the twenty-four month time period specified in Paragraph I.4 had expired. The court found that the meaning of the contract was clear, and that if the Operator had not intended to be bound by the limitation period of Paragraph I.4 the Operator should have so provided.[7]

The holdings and rationale of the preceding cases demonstrate that Paragraph I.4 entitles monthly billing statements to a conclusive presumption of correctness if written exception to such statements is not made within the specified time period. Contrary to Defendants' contention, neither Paragraph I.4 nor case law require payment by the Non–Operator as a prerequisite to the application of Paragraph I.4.

### 2. Paragraph I.4 and Miss.Code Ann. § 15–1–5

■ Defendants contend that Paragraph I.4 creates a contractual statute of limitations in violation of Miss.Code Ann. § 15–1–5. Miss.Code Ann. § 15–1–5 provides that:

> The limitations prescribed in this chapter *shall not be changed in any way whatsoever by contract between parties*, and any change in such limitations made by any contracts stipulation whatsoever shall be absolutely null and void, the object of this section being to make the period of limitations for the various causes of action the same for all litigants. (emphasis added). Miss.Code Ann. § 15–1–5 (1972).

Miss.Code Ann. § 15–1–5 undoubtedly prohibits parties from contractually implying their own statute of limitations. However, the United States District Court for the Northern District of Mississippi in *Brander v. Nabors*, 443 F.Supp. 764, 771–72 (N.D.Miss.), *affirmed* 579 F.2d 888 (5th Cir. 1978), held that contractual conditions precedent that must be met for rights to accrue do not violate Miss.Code Ann. § 15–1–5. *Brander* involved a denial of coverage under a medical malpractice insurance policy that provided coverage against claims made during the policy term. The court held that the time restriction in the policy was a valid condition precedent to the liability of the insurer, and was not an impermissible attempt to create a contractual statute of limitations in derogation of Miss.Code Ann. § 15–1–5. Miss.Code Ann. § 15–1–5, the court held, applies only to contractual provisions that limit the time within which action must be taken to enforce rights after the rights have accrued. *See Cox v. Lamar Life Insurance Co.*, 208 Miss. 146, 43 So.2d 884 (1950) (Contractual provision that required insured to submit proof of disability prior to reaching age sixty was condition precedent to coverage, and did not violate Miss.Code Ann. § 15–1–5); *Mutual Benefit Health & Accident*

---

7. Courts have upheld conclusive presumptions in indemnity agreements as well. *See Engbrock v. Federal Insurance Co.*, 370 F.2d 784 (5th Cir.

1967), and *Transamerica Insurance Co. v. Bloomfield*, 401 F.2d 357 (6th Cir.1968).

*Assn. v. Winter,* 209 Miss. 344, 46 So.2d 803 (1950) (Contractual provision that required insured to give written notice of disability within ten days of becoming disabled did not violate Miss.Code Ann. § 15-1-5). *See also Provident Life & Accident Insurance Co. v. Cumbest,* 325 So.2d 569 (Miss.1976) (Court upheld contractual provision that required insured to annually show disability).

The Court finds that Paragraph I.4 creates conditions precedent to be met before challenging the validity of monthly billing statements. Paragraph I.4 does not require a Non-Operator to file suit within twenty-four months of the calendar year in which a challenged bill is issued. Instead, Paragraph I.4 states that an Operator that fails to take timely "written exception," in whatever form may be appropriate, cannot later challenge the validity of billing statements.[8] Paragraph I.4 merely enumerates time-based conditions as predicates to a Non-Operator's right to challenge billing statements, and does not create a statute of limitations in violation of Miss.Code Ann. § 15-1-5.

### 3. Rebutting the Conclusive Presumption of Correctness

Paragraph I.4 states that all bills not objected to in writing within the time period shall "conclusively be presumed to be true and correct." Black's Law Dictionary defines "conclusive presumption" as

[an] artificially compelling force which requires the trier-of-fact to find such fact as is conclusively presumed and which renders evidence to the contrary as inadmissible.

A conclusive presumption established under Paragraph I.4, however, is not irrebuttable. According to the district court in *Caddo,* a conclusive presumption that all bills not excepted to are true and correct may be rebutted upon a showing of fraud or bad faith breach of contract. *Caddo* at 10.

Analogous case law is in accordance with *Caddo.* In *Fidelity & Deposit Co. of Maryland v. Bristol Steel & Iron Works, Inc.,* 722 F.2d 1160, 1163 (4th Cir.1983), the Fourth Circuit held that a provision in a surety contract that provided for payments to be made to a Surety in an "amount equal to the amount of the reserve set by the Surety" was enforceable, but was subject to an exception for payments made through fraud or lack of good faith by the surety. *See also Horne v. State Building Commission,* 233 Miss. 810, 103 So.2d 373 (1958), *rev'd on other grounds,* 421 So.2d 1046 (Miss.1982) (payments pursuant to a surety contract must be made in good faith).

In the case before the Court, Defendants have neither alleged nor proven fraud. As to the breach of contract requirement, Defendants plead as an affirmative defense that they are not liable for "costs that are the result of the gross negligence or willful misconduct of Plaintiff or the violation of Plaintiff's obligations under the Agreement." Amended Answer of Defendant. The Court assumes, for the purposes of this Motion, that the preceding affirmative defense alleges breach of contract by Plaintiff.

Defendants have not put forth evidence that would support a finding of breach of contract, and now ask the Court to deny, or in the alternative, to continue the Plaintiff's Motion for Partial Summary Judgment until Defendants can complete discovery on evidence relating to its affirmative defenses.

A court should refrain from ruling on a Motion for Summary Judgment where the non-moving party establishes that triable issues of fact remain to be discovered. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, 106 S.Ct. at 2505, 2511 n. 5, 91 L.Ed.2d 202 (1986). However, as Plaintiff correctly points out, a party must state specific facts that could be developed through additional discovery, *Taylor v. Gallagher,* 737 F.2d 134, 137 (1st Cir.1984),

---

**8.** The Court does not make a finding, as stated below, as to what constitutes "written exception."

and the specific facts must be relevant to the issues to be adjudicated. Wright, Miller & Kane, 10A, *Federal Practice & Procedure,* § 2741 at 588.

Here, Defendants state in their Memorandum in support of their Reply to Plaintiff's Motion for Partial Summary Judgment that additional discovery "may" establish facts to support the Defendant's pleadings. Defendant Stewart Gammill, III, General Partner of Defendant Crosby-Mississippi, states in his affidavit that further discovery has the "reasonable possibility of producing evidence of contractual violations." Neither Defendants' pleadings nor Mr. Gammill's Affidavit set forth specific instances of breach of contract, nor do they list the facts that might support a showing of breach of contract. The Court will not refrain from ruling on Plaintiff's Motion for Partial Summary Judgment simply because Defendants wish to engage in speculative discovery. *See Paul Kadair, Inc. v. Sony Corp. of America,* 694 F.2d 1017, 1030 (5th Cir.1983).

### 4. Reformation of the Joint Agreement

Defendants argue that Partial Summary Judgment should be denied because mutual or unilateral mistake requires reformation of the Operating Agreement. Defendants argue for mutual mistake because the parties have differing interpretations of Paragraph I.4, and, alternatively, argue for unilateral mistake if Plaintiff correctly interpreted Paragraph I.4 and Defendants mistakenly misinterpreted Paragraph I.4.

In addition, Defendants argue that the parties' differing interpretations of Paragraph I.4 results in a finding that the provision is ambiguous, thereby precluding Partial Summary Judgment.

#### a. Mutual Mistake

■ The general rule in Mississippi is that reformation of a contract is justified if there is a mutual mistake. *Johnson v. Consolidated American Life Ins. Co.,* 244 So.2d 400, 402 (Miss.1971). *See also United States Fidelity & Guaranty Co. v. Gough,* 289 So.2d 925, 927 (Miss.1974). The Fifth Circuit has held that only mistakes of fact, and not mistakes of law,

justify reformation. *Sunshine Grain Co. v. United States Fidelity & Guaranty Co.,* 270 F.2d 777, 780 (5th Cir.1959).

Here, Defendants contend that the parties did not understand the legal significance of Paragraph I.4. This is a mistake of law, and not a mistake of fact, and reformation on the theory of mutual mistake is accordingly inappropriate.

#### b. Unilateral Mistake

■ The general rule in Mississippi is that reformation of a contract is justified if there is a mistake on the part of one party and fraud or inequitable conduct on the part of the other party. *Johnson* at 402; *Gough* at 927. As with mutual mistake, reformation for unilateral mistake is justified only where there is a mistake of fact. *Sunshine Grain* at 780. Here, reformation of the contract on the theory of a unilateral mistake of the Defendants is inappropriate because the alleged mistake is a mistake of law.

#### c. Ambiguity and Parol Evidence

■ Defendants argue that the opposing interpretations of Paragraph I.4 advanced by both parties results in a conclusion that the provision is ambiguous, and presents an issue that can only be resolved by the admission of parol evidence before the trier of fact. Mere disagreement between the parties over the meaning of a contractual provision, however, does not make the contract ambiguous. *Cherry v. Anthony, Gibbs, Sage,* 501 So.2d 416, 419 (Miss.1987). Moreover, the preliminary question regarding purported contractual ambiguities is a question of law for the Court to decide. *Freeman v. Continental Gin Co.,* 381 F.2d 459, 465 (5th Cir.1967).

As stated earlier, the Court finds that the meaning of Paragraph I.4 is clear and unambiguous. There is no need for parol evidence because there is no ambiguity.

### 5. Does an Answer to a Lawsuit Constitute "Written Exception" within the Meaning of Paragraph I.4?

■ The Court has determined that Paragraph I.4 obligates a Non-Operator to

satisfy bills not excepted to in writing, in the absence of fraud or breach of contract.

"Written exception," however, is not defined in the Operating Agreement. Defendants contend that the filing of their Answer, their First Interrogatories and their First Request for Production of Documents in this proceeding on December 19, 1989 constitute "written exception" within the meaning of Paragraph I.4. If their Answer constituted written exception to the Plaintiff's billing statements, then Summary Judgment is inappropriate for all billing statements issued subsequent to December 31, 1986, because Defendants filed their Answer within twenty-four months of the end of calendar year 1987.

Plaintiff argues that Defendants' Answer did not comply with the contractual requirements for written exception, and contends that Defendants are therefore liable for all bills issued by Plaintiff. However, as stated earlier, there are no contractual provisions stipulating the requirements of written exception. The contract simply does not define written exception. Therefore, the Court finds that there remains a genuine issue of material fact concerning whether Defendants took written exception within the meaning of the Paragraph I.4 when they filed their Answer to the Plaintiff's lawsuit.

### 6. Is Receipt Necessary for the Conclusive Presumption of Correctness to Apply?

 Paragraph I.4 states that the conclusive presumption of correctness shall apply to "all bills and statements rendered to Non–Operators." Plaintiff argues that "rendered" means that the conclusive presumption of correctness attaches to all statements and bills that were mailed to Defendants, whether or not Defendants actually received the statements and bills. Defendants argue that actual receipt is necessary for the presumption to attach, and argue that they are not liable for the February and May 1985 Joint Account Statements, which they contend they did not receive.

The Court is of the opinion that actual receipt is necessary for the presumption of correctness to attach. A Non–Operator cannot be expected to take written exception to bills that it never had the opportunity to inspect. However, Plaintiff also prepared and mailed Status of Account Statements to Defendants, and these statements included the billing amounts for February and May 1985.[9] Paragraph I.4 clearly states that the conclusive presumption of correctness applies to bills and *statements*, and receipt of the statements which reflected the charges incurred in February and May 1985 gave Defendants an opportunity to take written exception pursuant to Paragraph I.4. Therefore, the Court finds that the conclusive presumption of correctness attaches to the amounts billed in February and May 1985.

For the foregoing reasons, the Court grants Plaintiff's Motion for Partial Summary Judgment as to all bills and statements rendered prior to January 1, 1987, in the amount of $428,668.76, and denies the Motion for Partial Summary Judgment as to all bills and statements rendered thereafter.

SO ORDERED.

---

**9.** The Status of Account statements issued in December 1986 reflected the billing amounts for February and May 1985.